**Daniel DUCHARDT, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**MIDLAND NATIONAL LIFE INSURANCE COMPANY, Defendant.**

**No. 4:07–cv–00351.**

United States District Court, S.D. Iowa, Central Division.

July 23, 2009.

---

13. *See* Brief in Support of Motion for Protective Order at 17 (docket number 52–2 at 17).

438

Steve W. Berman, Hagens Berman Sobol Shapiro LLP, Seattle, WA, Elizabeth A. Fegan, Daniel J. Kurowski, Timothy P. Mahoney, Hagens Berman Sobol Shapiro LLP, Oak Park, IL, J. Barton Goplerud, Michael P. Mallaney, Hudson Mallaney Shindler & Anderson PC, West Des Moines, IA, for Plaintiff.

William H. Higgins, Robert D. Phillips, Jr., Reed Smith LLP, San Francisco, CA, Randall G. Horstmann, Nyemaster Goode West Hansell & O'Brien, PC, Des Moines, IA, Henry Pietrkowski, Reed Smith LLP, Chicago, IL, for Defendant.

ORDER ON MOTION FOR CLASS
CERTIFICATION

ROBERT W. PRATT, Chief Judge.

Before the Court are Plaintiff's Motion for Class Certification and Defendant's Motion to Strike the Declaration and Opinions of Jeffrey K. Dellinger. Clerk's Nos. 22, 28. The Motion for Class Certification was filed by Daniel Duchardt ("Plaintiff" or "Duchardt") on June 9, 2008. Clerk's No. 22. On August 18, 2008, Midland National Life Insurance Company ("Defendant" or "Midland") filed its Opposition to Plaintiff's Motion for Class Certification and, in addition, filed a Motion to Strike the Declaration and Opinions of Jeffrey K. Dellinger (hereinafter "Motion to Strike"). Clerk's Nos. 27, 28. Duchardt filed a Response to Defendant's Motion to Strike on October 3, 2008 (Clerk's No. 40), and Midland filed a Reply in support of its Motion to Strike on October 17, 2008 (Clerk's No. 46). Duchardt filed a Reply in Support of the Motion for Class Certification on February 6, 2009.[1] Clerk's No. 61. Midland filed a Surreply on April 21, 2009. Clerk's No. 65. The Court heard arguments on Duchardt's Motion for Class Certification on June 11, 2009. Clerk's No. 70. Each of these matters are fully submitted.

Additionally pending before the Court is Duchardt's Motion for Leave to File Plaintiff's Reply in Opposition to Defendant's Surreply (hereinafter "Sur-surreply"). Clerk's No. 69. While the Local Rules do not provide for the filing of a Sur-surreply, the Court may consider such a filing at its discretion. Having reviewed the Sur-surreply, the Court finds that consideration of the document will provide some assistance to the Court in the resolution of the pending Motion for Class Certification. Accordingly, Duchardt's Motion for Leave to File the Sur-surreply is GRANTED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This putative class action concerns the assessment of interest under certain long-term, fixed indexed annuities (hereinafter "FIAs") sold by Defendant Midland to various persons throughout the United States, including to Plaintiff Duchardt. Mot. for Class Certification at 5, 10. These FIAs allow the policyholder to receive a base guaranteed rate of interest, plus a supplemental, non-guaranteed rate of interest linked to the performance of a stock index if the policyholder opts to allocate the funds in the FIA to an "Index Account." Id. at 5; Thesis Decl. ¶¶ 3, 14. Generally, when a policyholder has money in an "Index Account," an "Index Credit," that is, the amount of interest the policyholder earns on the account, is calculated each year or each month on the policyholder's anniversary date. Thesis Decl. ¶ 4. The anniversary date corresponds to the date on which the FIA was issued and may be almost any day of the year. Tr.[2] at 55. The policyholder may elect between various interest credit options: annual averaging; annual point-to-point; and, under certain FIAs, monthly point-to-point. Thesis Decl. ¶ 11. Each of these interest credit options can be tied to the performance of any one of a number of stock indices, e.g., Standard and Poor's 500, Dow Jones, Standard and Poor's Midcap 400, or Russell 2000. Mot. for Class Certification at 10; Thesis Decl. ¶ 10. In addition, the policyholder may elect to subdivide the funds in his account and apply different interest credit options separately to each group of subdivided funds. Thesis Decl. ¶ 12. The policyholder has the option of changing the interest credit options each year during the thirty days following the anniversary date. Id. ¶ 13.

The present contract dispute revolves around language in the FIA defining the "Index Value," a value which is used to calculate the "Index Credit." Mot. for Class Certification at 6–10; Thesis Decl. ¶ 5. Duchardt's FIA, at Provision 5.3, defines "Index Value" in the following terms:

> The Index Value on any specified date is the closing value on the previous trading

---

1. Duchardt had previously filed a Reply in Support of the Motion for Class Certification on October 20, 2008, but this filing was withdrawn. Clerk's Nos. 48, 57.

2. All references to the Transcript are to the Court's daily unedited RealTime transcript provided by the Court Reporter.

day associated with the index shown on the Specifications Page. If the Index Value is not available for any Index Value date, We [sic] will use the Index Value on the immediately preceding day for which the Index Value is available. . . .

Ex. A22. There is no dispute between the parties as to how this language should be interpreted when the anniversary date falls on a weekday. *See* Mot. for Class Certification at 7; Tr. at 57. However, when the anniversary date falls on a weekend day, either Saturday or Sunday, the parties disagree as to the proper interpretation of Provision 5.3. Under Duchardt's interpretation of the contract language, when the contract anniversary for his FIA falls on a weekend day, the "Index Value" should be calculated using the closing value of the applicable index on the previous Friday (hereinafter "Duchardt Method"). Mot. for Class Certification at 6–8. Under Midland's interpretation of the contract language, when the contract anniversary falls on a weekend day, the "Index Value" applied should be the previous Friday's "Index Value," which is, in fact, Thursday's closing value for the relevant index (hereinafter "Midland Method"). Def.'s Resp. at 10.

Duchardt owns a Midland "Bonus 11" FIA, and he states that the returns on his FIA would have been greater by $125.87 if the contract language was properly interpreted. Mot. for Class Certification at 10–11, 15. In addition to his own breach of contract claim, Duchardt proposes to represent all policyholders who own any one of eighteen different types of FIAs in this breach of contract action.[3] *Id.* at 1–2; *see* Pl.'s Exs. A1–A18.

The proposed class contains twelve FIAs whose definitions of "Index Value" omit the phrase "on the previous trading day."[4] *See* Pl.'s Exs. A1–A12. With regards to these twelve FIAs, it appears that the parties not only disagree as to what meaning should be ascribed to "Index Value" on weekends, but also disagree as to what meaning to ascribe to the term on weekdays. *Compare* Mot. for Class Certification at 7 (describing the "Index Value" as linked to the index closing value of the same day) with Tr. at 57 (describing Midland's practice as consistently deriving the "Index Value" from the index closing value of the previous day). Despite the differences between the language in the different versions of the FIAs, Midland has consistently used the closing value from Thursday to calculate the credited interest when the contract anniversary falls on a weekend. Def.'s Resp. at 9–10.

Duchardt contends that Midland breached all of the FIAs by uniformly misinterpreting the term "Index Value." Mot. for Class Certification at 1. In seeking to remedy the alleged breach of contract, Duchardt proposes to represent a class of all "recipients of value" of the above listed FIAs, for the purposes of injunctive and declaratory relief (hereinafter "Class"). *Id.* Additionally, he proposes to represent the following subclass of persons seeking money damages: "Recipients of value . . . where the contracts' values are lower due to Midland excluding from the interest crediting calculations the linked indices closing values on the Friday before a weekend when the contract anniversary fell on a weekend" (hereinafter "Subclass I").[5]

3. Duchardt proposes that his primary class include policyholders with the following FIAs: (1) AC061A; (2) AC064A; (3) AC067A; (4) AC078A; (5) AC079A; (6) AC081A; (7) AC089A; (8) AC102A; (9) AC103A; (10) AC105A; (11) AC106A; (12) AC107A; (13) AC082A; (14) AC091A; (15) AC092A; (16) AC093A; (17) AC094A; and (18) AC096A. Pl.'s Mot. at 1.

4. In the twelve FIAs numbered AC061A, AC064A, AC067A, AC078A, AC079A, AC081A, AC089A, AC102A, AC103A, AC105A, AC106A, and AC107A, Provision 5.3 sets forth the calculation of the "Index Value" as: "The Index Value on any specified date is the closing value associated with the index shown on the Specification Page. If the Index Value is not available for any Index

Value date, We [sic] will use the Index Value on the immediately preceding day for which the Index Value is available."

5. Initially, Duchardt sought certification of only the Class under Rule 23(b)(2). Duchardt proposed, only as an alternative, a subclass under Rule 23(b)(3) consisting of every policyholder who owns an FIA that has a lower accumulation value when the Midland method is applied. Mot. for Class Certification at 16–17, 28–29. The terminology Duchardt uses to describe his class structures has also varied between his filings. In his Complaint, Duchardt describes a single Class subdivided into an injunctive subclass (Subclass I) and an injunctive and money damages subclass (Subclass II). Compl. at ¶ 29. The Court

*Id.* at 2. Duchardt requests only prospective relief for Subclass I. Pl.'s Reply at 1. In addition, Duchardt seeks an "equitable and prospective remedy" that would "preserve any advantage already gained by the Class members for whom the Midland Method has generated a lower beginning basis value." *Id.* at 5. In support of the Motion for Class Certification, Duchardt has submitted declarations and expert opinions by Jeffery Dellinger ("Dellinger"), an actuary, and Jon Riddle ("Riddle"), an economist. Clerk's Nos. 25–17, 62–2.

Midland does not dispute Duchardt's calculation of his own damages. However, Midland contends that analysis of the Class claims will require extensive individualized legal and factual inquiries that preclude class certification. Def.'s Response at 2. In addition, Midland argues that the Class is fundamentally flawed because of intra-class conflicts. *Id.* at 1. Midland has submitted declarations by two Midland employees, Sarah Thesis ("Thesis") and Heath C. Williams ("Williams"), as well as an expert declaration and opinion by Craig Merrill ("Merrill"), a professor of finance and risk management, with its Surreply in opposition to the Motion for Class Certification. Clerk's Nos. 27–2, 45–2, 65–5.

## II. MOTION TO STRIKE EXPERT OPINION

■ Defendant Midland filed a Motion to Strike the Declaration and Opinions of Jeffery K. Dellinger, asserting that the declaration by Dellinger includes statements that: (1) are not relevant nor reliable because he does not provide support for his opinions in his declaration, and (2) improperly present a legal conclusion regarding the breach of contract claim. Midland requests the Court apply its gate-keeping function and strike Dellinger's declaration. Mot. to Strike at 3 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). At this stage of the case, expert reports are presented to the Court to assist it in assessing whether class certification is appropriate,

not to assess the underlying merits of the breach of contract claim. Therefore, "testimony should be judged on the basis of whether it supports class certification—not whether it meets the standards of admission at trial." *Bennett v. Nucor Corp.*, No. 3:04–cv–00291, 2006 WL 2473015, at *11 (E.D.Ark. Aug.25, 2006) (citing *Daubert*, 509 U.S. at 579, 113 S.Ct. 2786). Therefore, a district court need only "ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 134–35 (2d Cir. 2001). Having reviewed Dellinger's declaration, the Court concludes that the portion of his opinion which describes the FIAs contains no flaws that would render his opinion as a whole inadmissible as a matter of law. The Court will disregard any statements which might be interpreted as legal conclusions on the merits of the breach of contract claim. Accordingly, Midland's Motion to Strike the Declaration and Opinions of Jeffery K. Dellinger is DENIED.

## III. MOTION FOR CLASS CERTIFICATION

### A. *Class Certification Standard*

A proposed class must meet all the requirements of Federal Rules of Civil Procedure 23(a) and (b) in order to be certified. Section (a) of Rule 23 provides the prerequisites for any class action:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Section (b) then lays out additional requirements that must be satisfied, depending on the type of class action:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of

adopts the terminology and class structure most recently proposed by Duchardt, that of "Class" and "Subclass I," for the purposes of this Motion.

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

In addition, numerous courts have recognized the "implicit" requirement that the class definition must be drafted in such a way as to ensure that membership is ascertainable by some objective standard. *See, e.g., In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 360 (S.D.Iowa 2008) (collecting cases).

■ The party seeking to certify an action as a class action bears the burden of proof on all certification issues. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Blades v. Monsanto Co.*, 400 F.3d 562, 568 (8th Cir. 2005); *Bishop v. Comm. on Prof'l Ethics*, 686 F.2d 1278, 1288 (8th Cir.1982). A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). A district court has broad discretion in determining whether a particular action complies with the requirements of Rule 23. *See Sperry Rand Corp. v. Larson*, 554 F.2d 868, 873 (8th Cir.1977) ("The trial court is, of necessity, clothed with a good deal of discre-

tion in determining the appropriateness of a class action.").

■ "[I]n determining the propriety of a class action, the question is not whether the . . . plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (quoting with approval *Miller v. Mackey Int'l, Inc.*, 452 F.2d 424, 429 (5th Cir.1971)). "In making the Rule 23 analysis, the substantive allegations in the plaintiff's complaint are accepted as true." *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 573 (D.Minn.1995) (citing *Jackson v. Rapps*, 132 F.R.D. 226, 230 (W.D.Mo.1990)). Nevertheless, "[t]hough class certification is not the time to address the merits of the parties' claims and defenses, the 'rigorous analysis' under Rule 23 must involve consideration of what the parties must prove." *Elizabeth M. v. Montenez*, 458 F.3d 779, 786 (8th Cir.2006). The district court's review of the evidence under Rule 23 may require it to "resolve disputes going to the factual setting of the case and such disputes may overlap the merits of the case." *See Blades*, 400 F.3d at 567 (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676–77 (7th Cir.2001)). Where the parties rely on expert testimony to support their class certification arguments, a court may be required to resolve disputes regarding the import of expert testimony in demonstrating that the plaintiff's claims can be established through common proof. *Id.* at 575.

■ Impediments to Rule 23 certification may be cured by proper subclassing under Rule 23(c)(4) or (c)(5). *See Amchem*, 521 U.S. at 626–27, 117 S.Ct. 2231 (noting the potential that subclasses could alleviate the disparity of interests between current and future plaintiffs sufficiently to allow adequate representation for settlement purposes); *see also* Manual for Complex Litigation § 21.23 (4th ed. 2004) ("Subclassing sometimes represents a workable solution to differences in substantive law and for choice-of-law difficulties."). However, where conflicts and differences among the class members are quite sharp, class treatment, even with subclassing,

443

may not be justified. *See* Manual for Complex Litigation § 21.23 (4th ed. 2004). When subclasses are certified, each subclass must meet the requirements of Rule 23 and will be treated as a class. *United States Fid. & Guar. Co. v. Lord,* 585 F.2d 860, 865 (8th Cir.1978). The burden to construct subclasses is not on the district court, but rather, "[t]hat burden is upon the respondent and it is he who is required to submit proposals to the court. The court has no sua sponte obligation so to act." *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 408, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).

In opposing Duchardt's Motion for Class Certification, Midland presents numerous challenges. Midland maintains that Subclass I is not ascertainable. It also attacks the Rule 23(a) prerequisites of typicality and adequacy of representation for both the Class and Subclass I. Finally, Midland asserts that both the Class and Subclass I fail the more specific requirements under Rule 23(b). The Court addresses each of these contentions in turn.

B. *Implicit Prerequisite–Ascertainability*

■ "[C]lass definition is at the heart of any decision on certification." *In re Teflon,* 254 F.R.D. at 361. In addition to the requirements explicitly set forth in Federal Rule of Procedure 23, a "proposed class sought to be represented must be adequately defined and clearly ascertainable." *Ihrke v. N. States Power Co.,* 459 F.2d 566, 573 (8th Cir.1972) (citing *Weisman v. MCA Inc.,* 45 F.R.D. 258 (D.Del.1968)), *vacating judgment and remanding to dismiss as moot* 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972); *see also* Manual for Complex Litigation § 21.222 ("Although the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable."). The Court should not have to engage in lengthy, individualized inquiries in order to identify members of the class. *Dumas v. Albers Med., Inc.,* No. 03–0640, 2005 WL 2172030, at *5 (W.D.Mo. Sept. 7, 2005) (citing *Simer v. Rios,* 661 F.2d 655, 669 (7th Cir.1981)).

Duchardt defines Subclass I as: "Recipients of value ... where the contracts' values are lower due to Midland excluding from the interest crediting calculations the linked indices closing values on the Friday before a weekend when the contract anniversary fell on a weekend." Mot. for Class Certification at 2. Duchardt proposes that membership in Subclass I can be determined by re-calculating the interest that would have accrued to each FIA if the Duchardt Method were applied. He suggests that it will be no impediment that many policyholders have changed the distribution of funds within their account and made withdrawals from their accounts, subject to certain penalties, from year to year. Midland contests this suggestion strongly and states that its own attempts to calculate the change in FIA values using the Duchardt Method led to scenarios where the hypothetical account values were incongruent with the withdrawals and transfers that had been historically applied to the FIA. Williams Decl. ¶ 5. Midland asserts that any attempt to recalculate the policy values will require individualized inquiries regarding each policyholders' decision-making process.

Duchardt seemingly concedes the conceptual obstacle inherent in the re-calculations and proposes the use of a formula and assumptions to avoid these problems.[6] Duchardt's expert states that it would be possible to recalculate the earnings under the Duchardt method with "a few very obvious assumptions." Riddle Decl. at 7. He suggests that these recalculation would be based on other available data and would assume that the policyholders applied the "same decision process" and, thus, the assumptions do not constitute speculation. *Id.* at 8–9.

The Court cannot agree that the use of such assumptions does not amount to speculation; indeed, employing assumptions to presume what choices a policyholder may

---

6. Duchardt also argues that the situation that Midland warns of will only arise when a policyholder has moved funds from an indexed account after that policyholder has encountered a weekend anniversary, reducing the number of policies that cannot be recalculated easily by approximately a third. While the Court agrees with this assertion, it regards the process of making individual inquiries into the decision-making process of what would still be many thousands of policyholders as prohibitive.

have made under alternative circumstances is inherently speculative. Midland has provided the Court with a number of examples where a policyholder has made changes to the balance of an account for which the underlying reasoning was not apparent, and the choice did not appear economically rational. Merrill Decl. at ¶¶ 41–54; *see also* Tr. at 72–81 (providing additional examples in which recalculation would require additional information regarding the reasons for the policyholder's investment strategy). Based on the Court's reading of these examples, it concurs with Midland's expert when he states:

> The policyholder database reveals *what* a policyholder did in a particular circumstance but it does not give the reasons *why* the policyholder behaved in a particular manner. Without knowing why a policyholder made a particular choice one cannot say what the policyholder would do in a different circumstance, such as when crediting rates differ under Duchardt's method.

Merrill Decl. at ¶ 47. Indeed, Midland has shown that the application of different assumptions during a recalculation would lead to such varied results that the policyholders' exclusion/inclusion in Subclass I might be reversed. The Court concludes that any model which does not incorporate the "why" of past investment decisions will not produce a reliable recalculation of the account values. While Duchardt's proposition is an interesting modeling exercise, it cannot provide the certainty required to establish membership in a class or subclass for the purposes of class certification.[7]

■ The Court also notes that the membership of Subclass I is constantly shifting. Because the interest credit is an on-going calculation based on previous and future index performance, a policyholder's comparative gains (or losses) under the Midland Method may shift to losses (or gains) during the time the case is pending. In effect,

several policyholders, who would have been included in, or excluded from, Subclass I at the time of certification, could find that by the end of a trial on the merits, they would instead be excluded from, or included in, Subclass I. Duchardt's proposed solution to this impediment would have the Court concretely set Subclass I membership on the date of certification, and then apply its equitable powers to retroactively recalculate the interest to invariably benefit the policyholders. The Court finds this proposition untenable. First, the proposition that the Court has equitable powers, which it might deem appropriate to use at a much later remedial stage in the litigation, cannot be relied upon to cure problems of ascertainability with the class at the outset of the case. Second, the implementation of such an equitable remedy would present daunting logistical problems, and Duchardt provides no suggestions as to how the Court would go about applying such equitable relief to thousands of policyholders. Accordingly, the Court concludes that Subclass I cannot be ascertained without extensive individualized inquiries. This alone prohibits class certification as to Subclass I, even if the other deficiencies discussed below were remedied.

### C. *Rule 23(a) Prerequisites*

#### 1. *Numerosity.*

■ The first Rule 23(a) prerequisite for class certification, numerosity, is satisfied when the proposed class contains sufficient numbers that joinder of all the putative class members would be impracticable. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir.1982). The parties agree that the number of contracts encompassed in the Class surpasses 200,000, and Midland's own expert suggests approximately one-half of those persons could qualify for Subclass I. Merrill Decl. ¶¶ 29–34 (concluding that there is no statistical advantage to either the Duchardt

---

7. Duchardt suggests that arithmetical exactitude is not required. Pl.'s Reply at 19 (citing *Lowe v. E.I. Du Pont de Nemours & Co.*, 802 F.2d 310, 311 (8th Cir.1986)). Arithmetical exactitude is not required in cases such as *Lowe*, where the jury was calculating the damages that should be awarded after the return of a verdict, but the need for certainty here is a wholly different proposition. In this case, the inability to calculate the damages with certainty infects the fundamental formation of Subclass I. Indeed, such arbitrary inclusion and exclusion in a monetary damages subclass that will be binding on all policyholders raises concerns with constitutional implications.

or Midland Method). The joinder of this number of plaintiffs would be impractible and, accordingly, the Court is satisfied that Duchardt's proposed Class and Subclass I both meet the numerosity prerequisite.

### 2. Commonality.

■ Federal Rule of Civil Procedure 23(a)(2) requires "questions of law and fact common to the class." While it is not necessary to demonstrate that every question of law or fact is common to each member, at least one of the elements of the cause of action must be shared by all class members. *Lockwood*, 162 F.R.D. at 575 (citing *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993)). "[C]lass members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same harm will suffice." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994). Here, the low threshold requirement of commonality is met by the shared common question regarding the interpretation of the "Index Value" provision in Midland's FIAs.

### 3. Typicality.

■ The Rule 23(a)(3) typicality requirement is intended "to limit the class claims to those fairly encompassed by the named plaintiff's claims." *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). Typicality under Rule 23(a)(3) suggests "there are other members of the class who have the same or similar grievances as the plaintiff." *Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269, 1275 (8th Cir.1990) (quoting *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir.1977)). The burden is "fairly easily met so long as other class members have claims similar to the named plaintiff." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir.1996) (citing *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir.1995)). However, "[t]he presence of a common legal theory does not establish typicality when proof of a violation requires individualized inquiry." *Elizabeth M.*, 458 F.3d at 787 (citing *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1004–05 (8th Cir.2004)). " 'The

proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Bublitz v. E.I. du Pont de Nemours & Co.*, 202 F.R.D. 251, 257 (S.D.Iowa 2001) (citing *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y.1981)). For the reasons detailed below, the Court must conclude that Duchardt has not met his burden to demonstrate the typicality claims amongst putative class members.

### a. Varying contracts.

■ As an initial matter, the breadth of Duchardt's Class, which includes FIAs with different definitions of "Index Value," poses a typicality problem. In describing which date should be used to assess the proper "Index Value," twelve of the FIAs contain a definition of "Index Value" that makes no mention of "the previous trading day" (hereinafter "Version 1"), whereas Duchardt's FIA and 5 other FIAs direct the reader to the closing value "on the previous trading day" (hereinafter "Version 2"). Mot. for Class Certification at 6–7; Thesis Decl. at 6. The Court does not agree with Duchardt's suggestion that because Midland interprets the two versions in the same manner, the differences in the wording are not meaningful. Indeed, the differences are evident in the different interpretations proposed by Duchardt himself. Duchardt would read Version 1 contracts to the effect that "Wednesday's Index Value is the linked index's closing value on Wednesday; . . .; Friday's Index Value is the linked index's value on Friday." With regard to Version 2, however, Duchardt suggests that "Thursday's Index Value is the linked index's closing value on Wednesday; . . .; Friday's Index Value is the linked index's value on Thursday." Mot. for Class Certification at 6–7. The Court agrees with Duchardt's apparent assessment that the use of the term "on the previous trading day" in some policies, and its absence in others, clearly suggests differing contract interpretations. In fact, it is likely that the phrase "on the previous trading day" will be so central to Plaintiff's breach of contract claim that its

presence or absence could affect whether there was a breach of contract at all. Thus, the Court concludes that Duchardt will not be able to advance the interests of policyholders who hold FIAs with the Version 1 definition of "Index Value." [8] Though this failing might be cured through a narrowing of Duchardt's proposed classes, or through the creation of a separate subclass of policyholders with Version 1 FIAs, such modifications would be fruitless since other problems, as set forth below, fatally infect the typicality of the proposed Class and Subclass I.

### b. Individualized inquiries.

■ Minor differences, or differences in damages, will not impede the typicality of class claims. *Alpern*, 84 F.3d at 1540. However, the Eighth Circuit has held that significant factual and legal variations requiring extensive individualized inquires may impede typicality. *Elizabeth M.*, 458 F.3d at 786–87. In *Elizabeth M.*, the district court had certified a class of present and former female patients who alleged that personnel at medical health facilities failed to protect them from assault by both staff and fellow patients, in violation of their statutory and constitutional rights. The Eighth Circuit noted that because the applicable legal standards for the differently situated failure to protect claims varied and because the claims could not be proved through common evidence, extensive inquiry into the individualized circumstances of each patient would be required. *Id.* at 787. Since proof of a violation would require individualized inquiries, the Eighth Circuit concluded that one plaintiff's assault claim was not typical of other class members' claims. *Id.*

The ultimate question in this breach of contract case will be whether the Midland Method or the Duchardt Method prevails.

Though both parties assert that the contract language is unambiguous in their favor, the Court cannot agree with either such assertion. Upon an initial examination, the contract language at issue appears ambiguous, in part due to the seemingly incompatible use of the terms "Index Value" and "Index Value date" and, in part due to the unclear role of the second sentence of provision 5.3, which might serve as either a narrowing condition on the first sentence, or as a secondary descriptor of the term "Index Value." Indeed, Duchardt's own arguments assign different roles to the second sentence of the "Index Value" definition in Version 1 FIAs and Version 2 FIAs to reach the conclusion that Friday's close value should be applied under both contract versions. Mot. for Class Certification at 6–7. On this basis, the Court comes to the preliminary conclusion that it may later find the contract language ambiguous.

Because the legal question before the Court is one of state law, and because the law of 47 states in which the FIAs were sold vary as to their rules governing contract interpretation, especially regarding the use of extrinsic evidence in contract interpretation,[9] the Court must assess which substantive state law should be applied to the breach of contract claims. *See In re St. Jude Med.*, 425 F.3d 1116, 1120 (8th Cir.2005) ("The Supreme Court has held an individualized choice-of-law analysis must be applied to each plaintiff's claim in a class action.") (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 838, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)). As jurisdiction in this case is based on diversity, this Court will be required to follow Iowa's choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Iowa has adopted the Restatement

---

8. Midland also notes that certain Version 1 FIAs contain additional differences from other Version 1 FIAs, potentially complicating the treatment of Version 1 FIAs as a class or a subclass. Def.'s Surreply at 12–15; Tr. at 50–51. The Court need not address this argument since it concludes that Duchardt's proposed class cannot include any of the Version 1 FIAs because his claim is not typical of any of the Version 1 FIAs, and he cannot adequately represent policyholders with Version 1 FIAs.

9. Though the parties dispute the degree to which the state laws differ, both agree that some variations exist. *See* Def.'s Response, Ex. 3; Pl.'s Reply, Ex. B9; *see also* Joel S. Feldman et al., *Class Certification Issues for Non-federal Question Class Actions—Defense Perspective*, 777 Practicing Law Institute, Litigation 35, 100–01 (2008) (listing important variations for a breach of contract claim between the laws of the 50 states).

(Second) of Conflict of Laws (1971) (hereinafter "Restatement") as its choice-of-law provision.[10] *Cole v. State Auto. & Cas. Underwriters,* 296 N.W.2d 779, 781 (Iowa 1980); *see also Washburn v. Soper,* 319 F.3d 338, 342 (8th Cir.2003) (collecting citations). Duchardt argues that the "most significant relationship test" set forth in section 188 of the Restatement is controlling and that test will require the application of Iowa law to each of the breach of contract claims. Midland counters that section 192 of the Restatement also applies and, therefore, the Court will be required to examine each policy under the state law where the policy holder was domiciled and the policy was issued.

Generally in contract cases, Iowa applies section 188 of the Restatement, "Law Governing in Absence of Effective Choice by the Parties," which states that the law of the state with the most significant relationships or interests in the transaction should be applied to the contract dispute. *Cole,* 296 N.W.2d at 781. Section 188(2) of the Restatement sets forth several factors that should be weighed against each other, given their relative importance with respect to the particular issue, in determining the law applicable to an issue:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

While section 188 of the Restatement sets forth the general principles which will guide a court's examination, several subsequent sections in the Restatement further elucidate the weight given particular factors under more specific circumstances. Restatement, §§ 189–97. Section 192 of the Restatement, "Life Insurance Contracts," provides that where a contract dispute involves life insurance contracts, which includes annuities such as the FIAs at issue here, the governing law is "the local law of the state where the insured was domiciled at the time the policy was applied for, unless, with respect to the particular issue, some other state has a more significant relationship...." *See id.* § 192, cmt. l(stating annuity contracts are governed by the same choice of law rules as are life insurance contracts).[11]

◼ Though no Iowa court has had occasion to apply section 192 of the Restatement, the Iowa Supreme Court has applied the analogous section 193 of the Restatement, "Contracts of Fire, Surety or Casualty," to further guide its application of the "most significant relationship" analysis. *Gabe's Const. Co., Inc. v. United Capitol Ins. Co.,* 539 N.W.2d 144, 146–47 (Iowa 1995) (applying section 193 of the Restatement, which provides for the application of "the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless, with respect to the particular issue, some other state has a more significant relationship ... to the transaction and the parties, in which event the local law of the other state will be applied"). Given the Iowa precedents which endorse the use of the Restatement choice of law rules, especially *Gabe's Construction Co.,* which applies section 193 of

---

10. Midland also argues that statutes of limitations and accrual rules vary significantly across the States, and the Court would be required to perform individualized inquiries as to these legal matters as well. The Court concludes that this argument lacks merit since Iowa's choice of law rules, consistent with the Restatement (Second) of Conflict of Laws, requires the application of Iowa law to procedural rules, and Iowa has traditionally viewed statutes of limitations and accrual rules as procedural rules. *Cameron v. Hardisty,* 407 N.W.2d 595 (Iowa 1987); *Harris v. Clinton Corn Processing Co.,* 360 N.W.2d 812, 814 (Iowa 1985). Assuming neither exception set forth in *Cameron* applies, the Court anticipates that it would apply Iowa statutes of limita-

tions and accrual rules to each of the breach of contract claims. *Cameron,* 407 N.W.2d at 595.

11. The Restatement's rationale is that "life insurance is a matter of intense public concern," "local law of the state [ ] has the dominant interest in the insured," and "a major purpose of life insurance legislation is to protect the individual insured and his beneficiaries, and the courts have sought to assist in achievement of this purpose ... by requiring that, at least as a general rule, the insured should receive the protection accorded him by the local law of his domicile." *Id.* § 192, cmt. c.

the Restatement, the Court concludes that the presumption set forth in section 192 of the Restatement in favor of applying the law of the state in which the insured was domiciled should be applied.

The Court is not persuaded by Duchardt's suggestion that because Midland's principal place of business is Iowa and the contract referenced an Iowa address, the Court should conclude that the "most significant relationship" is with Iowa, regardless of his citation to this Court's decision in *Grove v. Principal Mutual Life Insurance Co.*, 14 F.Supp.2d 1101, 1104, 1106–07 (S.D.Iowa 1998).[12] In *Grove*, this Court engaged in a conflict of laws analysis in which it applied section 188 to numerous common law claims, including the plaintiffs' claim that the defendant had breached the terms of their life insurance policies. After considering the five factors set forth in section 188, the Court concluded, without discussing section 192 of the Restatement, that Iowa had the most significant relationship to the *Grove* litigation. *Id.* The Court focused on plaintiffs' claim that the facts underlying the breach of contract claim arose in Iowa and the fact that one of the two named plaintiffs had left their original domiciliary state of Florida after the purchase of the life insurance policies. *Id.*

Here, the only apparent tie to Iowa in the present litigation is Midland's business headquarters in Iowa. Accordingly, the Court believes that the presumption in section 192

of the Restatement, as well as the other factors set forth in section 188, requires that each policyholder's breach of contract claim be considered under the laws of that policyholder's domiciliary state. The need to apply many different legal standards will disrupt the typicality of Duchardt's breach of contract claim.

In addition, the Court can anticipate that it will be required to engage in numerous fact-laden inquiries into the formation process of each policy. Under Iowa law, as well as the law of several other states, the Court may use extrinsic evidence of the subjective understanding of the parties, even where the agreement appears clear on its face, to determine whether the contract language at issue is ambiguous. *See, e.g., Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008).[13] Duchardt asserts that the policyholders could not have had any intentions as to the interpretation of the term "Index Value" since the contracts are form contracts, which are provided to the purchasers of the FIAs only after purchase. However, Midland notes that there are several forms of extrinsic evidence it may seek to introduce later, i.e., communications between the policyholders and Midland employees during the "free look" period and evidence of policyholder expectations formed by prior experiences with Midland FIAs. Based on the plausibility that Midland would indeed find and intro-

---

12. The other cases cited by Duchardt are not instructive as they do not consider breach of contract claims. See *Rakes v. Life Inv. Ins. Co. of Am.*, No. 06–cv–99, 2007 WL 2122195, at *8 (N.D.Iowa July 20, 2007) (addressing fraud and tortious breach of the implied covenant of good faith and fair dealing); *Bendzak v. Midland Nat'l Life Ins. Co.*, 440 F.Supp.2d 970, 983–85 (S.D.Iowa 2006) (considering a civil conspiracy claim); *Cunningham v. PFL Life Ins. Co.*, 42 F.Supp.2d 872, 882–85 (N.D.Iowa 1999) (bringing tort claims).

13. Duchardt cites a 2006 Iowa Supreme Court case for the proposition that extrinsic evidence is not permitted except after a court has already concluded that the contract language is ambiguous. *Clinton Physical Therapy Servs. P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 615 (Iowa 2006) ("[W]hen the language is ambiguous, we must engage in a process of interpretation to search for the meanings attached by each party at the time the contract was made."

To reveal this intent, extrinsic evidence is admissible when it sheds light on the situation of the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to attain.") (internal quotations and citations omitted). Upon a careful reading of the case, the Court does not believe that the language Duchardt quotes from *Clinton Physical Therapy Services* addresses the admissibility of extrinsic evidence *to reveal latent ambiguities.* More importantly, the Iowa Supreme Court clearly reaffirmed the rule that ambiguity may be revealed by extrinsic evidence, even where the agreement appears clear on its face, in 2008 when it stated: "Long ago we abandoned the rule that extrinsic evidence cannot change the plain meaning of a contract. We now recognize the rule in the Restatement (Second) of Contracts that states the meaning of a contract 'can almost never be plain except in a context.'" *Pillsbury Co.*, 752 N.W.2d at 436.

duce such testimony,[14] the Court concludes that it is likely that it would have to engage in individual factual inquiries into the facts surrounding the formation of multiple FIAs—potentially thousands of contracts.[15]

Thus, the Court concludes that adjudication of this breach of contract class action would necessitate numerous individualized factual inquiries and legal analyses which would obstruct the typicality of Duchardt's breach of contract claim.

### 4. *Adequate representation.*

Rule 23(a)(4) requires that the named plaintiffs "fairly and adequately protect the interests of the class, and not have antagonistic interests." [16]  *Paxton,* 688 F.2d at 562–63; *Eisen,* 391 F.2d at 562.  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Amchem,* 521 U.S. at 625, 117 S.Ct. 2231 (citing *Falcon,* 457 U.S. at 157–58, n. 13, 102 S.Ct. 2364).

A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class.  In such a situation, the named representatives cannot "vigorously prosecute the interests of the class through qualified counsel" because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members. *Valley Drug Co. v. Geneva Pharm., Inc.,* 350 F.3d 1181, 1189 (11th Cir.2003).

Duchardt argues that through his forthrightness and vigor to date, he has demonstrated that he is an adequate class representative for both the Class and Subclass I. In particular, he points to the spreadsheets that he has developed to assess the performance of his own FIA and to predict the overall performance of the FIAs under certain market conditions.[17]  The Court does not doubt Duchardt's vigor in pursuing his claims against Midland; however, it is genuinely concerned that because his interests do not align with those of many other policyholders, he cannot adequately represent their interests.

The core of Midland's intra-class conflict argument is that many of the policyholders have benefitted, or stand to benefit in the future, under the Midland Method.  Because the value of the FIA will vary depending on the closing value of the selected index, as well as on whichever anniversary date applies to that particular FIA, and because stock market behavior is unpredictable, some

---

**14.** Duchardt also suggests that since Midland has not yet produced any extrinsic evidence, the Court should dismiss this argument.  The Court does not find merit in this proposition.  Though Midland has not begun to depose policyholders other than Duchardt at this early stage of litigation, it asserts that should the case be certified, it would depose numerous policyholders to ascertain their understanding of the terms of their FIAs, especially those who had purchased additional FIAs after a previously held FIA had an anniversary date which fell on a weekend.  Tr. at 43.  There is no burden upon Midland to produce the extrinsic evidence upon which it will rely to dispute the merits of Duchardt's claim at the class certification stage of the litigation.  *Cf. Bishop,* 686 F.2d at 1288 (8th Cir.1982) (stating that the burden to establish the certifiability of a class action rests with the named plaintiff); *Blades,* 400 F.3d at 566–67 (noting that disputes which overlap with the merits of the case should be avoided unless resolution is required to determine whether the proposed evidence will be sufficient to support class certification).

**15.** Though the number of contracts would be reduced if the Court excluded all contracts with "Version 1" language, the number of contracts remaining in the Class would still surpass 70,-000, a number which the Court considers unmanageable for individualized inquiry.  *See* Pl.'s Ex. A19 at 3.

**16.** Before the 2003 amendments to the Federal Rules of Civil Procedure, subsection (a)(4) inquiries also included an examination of whether "the representative parties will vigorously prosecute the interests of the class through experienced, qualified counsel." *Paxton,* 688 F.2d at 562–63; *Eisen,* 391 F.2d at 562.  The question of how a court supervises appointment of counsel to represent a class is now governed subsection (g) to Rule 23.

**17.** The parties dispute the admissibility of the two spreadsheets created by Duchardt.  The Court need not decide at this stage of litigation whether the spreadsheets would be admissible at trial, and now only considers the existence of the spreadsheets for the purpose of assessing Duchardt's adequacy as a representative of the class.

policyholders will invariably benefit from the use of a Thursday close value on certain weekends, while other policyholders will benefit from a Friday close value on the same and/or different weekends. Ducardt has shown that he has sustained losses under the Midland Method, but Midland has provided examples where policyholders have benefitted, or can be expected to benefit in the future, from the Midland Method. *See* Thesis Decl. ¶¶ 21–25. Ducardt and his expert seemingly concede that at least some members of the Class are likely to have benefitted from the Midland Method. Pl.'s Dep. at 174–78; Dellinger Decl. ¶ 36. Further, Midland's expert suggests that the number of "winning" and "losing" policyholders under either the Midland or the Ducardt Method is approximately even.[18] Merril Decl. ¶¶ 29, 33. The Court has reviewed each of the declarations filed by the experts and by Midland's employees and is persuaded that, given the natural variability of the stock market, there will invariably be clear "winners" and "losers" under either the Ducardt Method or the Midland Method, both in the past, and moving forward from the present.[19] Thesis Decl. ¶¶ 21–25.

The Fourth Circuit was faced with a similar divergence of interests in the proposed plaintiff class in *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 337–40 (4th Cir.1998). In *Broussard*, the class certified by the district court included past and current franchisees; the current franchisees included those who had entered into agreements to release their claims against the franchisor and, therefore, had no interest in maintaining the litigation, as well as franchisees who had rejected the settlement agreements. *Id.* at 338. The Fourth Circuit noted a variety of economic conflicts, emphasizing how the current franchisees, especially those with release agreements, had "interests in the long-term financial health of the company [that] were imperiled by plaintiffs' efforts to wring a large damage award out of defendants." *Id.* Several of the franchisees had even sought to intervene in the class action to argue that "[p]ursuing a damage remedy ... was at best irrelevant and at worst antithetical to the long-term interests of a significant segment of the putative class." *Id.* at 339.

Likewise, here, the Court considers it likely that the policyholders who have seen better returns under the Midland Method are likely to hold the view that the remedy sought by Subclass I is counter to their interests. In addition, the Court notes that many persons have strong beliefs regarding patterns of market performance and these disparate beliefs may be an additional source of conflict between Ducardt and those putative class members that believe the Midland Method will produce higher returns for their FIAs in the future. Despite Ducardt's efforts to carefully tailor a remedial scheme

---

18. Ducardt addressed a letter to the Court on July 15, 2009, submitting as supplemental authority *Kohen v. Pac. Inv. Mgmt. Co., LLC*, 571 F.3d 672 (7th Cir.2009). Clerk's No. 71. The Court sees clear distinctions between *Kohen* and the present case. In *Kohen*, the Seventh Circuit affirmed the district court's certification of a class of purchasers of futures contracts who asserted the defendant violated federal law in its efforts to corner the futures market. *Id.* at 674. The Seventh Circuit dismissed PIMCO's arguments that a conflict between "short" (losing) and "long" (winning) speculators existed within the plaintiff class, noting that PIMCO had failed to provide any support for this proposition beyond its hypothetical scenarios. *Id.* at 677. Further, the Seventh Circuit noted that even if such a conflict existed, the number of "long" speculators in the class would be few. *Id.* at 676. Here, Midland has provided evidence that there are, in fact, winners and losers under the Midland Method, and that the proposed Class is split approximately evenly between those winners and losers.

19. Ducardt submits a spreadsheet that he purports shows that "in a generally rising market, under the averaging crediting methodology, a market rise on the Friday before the weekend *slightly* benefits the Midland Method, but a market fall of equal magnitude on that Friday *significantly* benefits the [Ducardt] Method." Pl.'s Sur-surreply at 6. The Court notes, however, that while Ducardt has presented one hypothetical situation in his spreadsheet following this pattern, he does not assert that the actual data from the policies shows such a pattern, nor that more robustly modeled exercises of FIA performance, such as the random path analysis with a large number of iterations (1,000,000 random index paths) submitted by Midland, support an assumption that this is the norm. *See id.*; Merrill Decl. ¶¶ 28–34. The Court cannot certify a class contingent upon an assumption that has no support in the record and, furthermore, is not actually asserted as a fact by any party.

that averts the most obvious conflicts between the "winners" and "losers," the Court does not believe that a remedial scheme can side-step the need for adequate representation of all subgroups within a larger injunctive class when those subgroups have clearly conflicting positions.

Subclassing has the potential to alleviate an inadequacy in representation, but here, the subclass structure proposed by Duchardt is insufficient to satisfy the adequate representation requirement. Duchardt has not proposed the creation of a subclass to represent those persons who have seen, or expect to see, further benefits under the Midland method and would, thus, argue for the Midland method. Additionally, Rule 23(a)(4) would require that an appropriate representative be found and appointed to act as a named plaintiff to represent that subclass. No such person is presently before the Court, and the burden is on the party seeking class certification to provide a solution to this impediment to class certification. Accordingly, the Court must conclude that Duchardt has not shown that he can satisfy the adequate representation prerequisite given the conflicts which exist within the Class.

### D. *Rule 23(b) Requirements*

Duchardt has sought certification of the Class under Rule 23(b)(2) and certification of Subclass I under Rule 23(b)(3). Even if Duchardt's proposed Class and Subclass I did not fail to meet the Rule 23(a) prerequisites, the Court concludes that they cannot satisfy the requirements for certification set forth under Rule 23(b)(2) and Rule 23(b)(3).

### 1. *Rule 23(b)(2) cohesiveness.*

■ A class action is maintainable under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." It is not atypical to certify a class pursuant to Rule 23(b)(2) where the plaintiff alleges a course of conduct generally applicable to the class and seeks monetary relief secondary to his request for declaratory and injunctive relief.

See *DeBoer,* 64 F.3d at 1175 (noting that the fact that damages sought were incidental to injunctive relief allowed for certification of settlement class under Rule 23(b)(2)); *Smith v. United HealthCare Servs., Inc.,* No. 00–1163, 2002 WL 192565, at *5 (D.Minn. Feb.5, 2002); *Bublitz,* 202 F.R.D. at 259. Some factual differences are expected within any injunctive class, and this alone does not defeat cohesiveness. See *Jefferson v. Ingersoll Intern. Inc.,* 195 F.3d 894, 897–98 (7th Cir. 1999) (discussing the use of Rule 23(b)(2) in an employment discrimination case where the factual differences between differentially situated plaintiffs may allow for differential damages). However, in *In re St. Jude,* the Eighth Circuit rejected the certification of a medical monitoring class under Rule 23(b)(2) because it presented too many individualized factual and legal issues. 425 F.3d at 1122. The Eighth Circuit stated:

> Because unnamed members are bound by the action without the opportunity to opt out of a Rule 23(b)(2) class, even greater cohesiveness generally is required than in a Rule 23(b)(3) class. A suit could become unmanageable and little value would be gained in proceeding as a class action ... if significant individual issues were to arise consistently.

*Id.* at 1121–22. To ascertain whether the required cohesiveness is present, the Court must examine whether the injuries to be remedied are really group injuries, as opposed to individual injuries. *Id.*

■ Measured against this high bar, the Court concludes that the Class is not sufficiently cohesive to allow class certification. First, the injuries to the proposed Rule 23(b)(2) Class appear to be individual in nature, rather than group injuries. As noted above, it is likely that approximately half of the proposed class have incurred no injury, but rather have benefitted, from the Midland Method. Furthermore, significant individual issues can be expected to arise which will undermine the similarities in the claims presented by the class members. As discussed above, Iowa choice of law rules will require the application of the local law of the various states in which each of the policyholders are domiciled, and state contract law which al-

lows the introduction of extrinsic evidence for the purposes of contract interpretation. Both the legal and factual variations will disrupt the cohesion required for Rule 23(b)(2) certification.

2. *Rule 23(b)(3)-predominance and superiority.*

■ The Court also concludes that Subclass I cannot qualify for certification under Rule 23(b)(3). Rule 23(b)(3) requires that common questions of law or fact "predominate over any questions affecting only individual members" and that resolution of the matter as a class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem*, 521 U.S. at 615, 117 S.Ct. 2231. "Even if Rule 23(a)(2)'s commonality requirement is satisfied ..., the predominance criterion under Rule 23(b)(3) is far more demanding." *Id.* at 623–24, 117 S.Ct. 2231. This rule "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623, 117 S.Ct. 2231. "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." *Blades*, 400 F.3d at 566 (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 136–40); *see also Owner–Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*, 339 F.3d 1001, 1012 (8th Cir.2003) (affirming the district court's denial of class certification on the basis that the required showing of injury would require individual determinations and that questions affecting individual class members would predominate over common questions of law or fact).

Duchardt asserts the predominant issue presented here is the interpretation and application of the term "Index Value." Certainly, the ultimate question of how the term "Index Value" should be interpreted is common to each of the claims, but the Court has concluded that Duchardt will not be able to rely on common evidence to prove that ultimate question. The individualized inquiries

into each policyholder's breach of contract claim, both in terms of the applicable legal standard, and the facts which may demonstrate the intent of the parties, will necessarily interfere with the predominance required to certify a class under Rule 23(b)(3).

In addition, the Court concludes that the superiority portion of Rule 23(b)(3) is unsatisfied with respect to Subclass I. Rule 23(b)(3) sets forth four factors to apply in determining if a class action is the superior method for adjudicating a controversy:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Duchardt argues that a class action would be superior to individual actions because it would provide an economical vehicle to dispose of a large number of potential claims. He also notes that other courts have stated that "a denial based on manageability 'should be the exception rather than the rule.'" Mot. for Class Certification at 33 (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 140). If only these considerations were to be weighed, the Court might agree. However, in this case, the Court has noted that if the Class and Subclass I were certified, individualized inquiries would be required simply to ascertain membership in Subclass I. In addition, a multitude of individual legal and factual inquiries would ensue as the Court considers the parties' arguments on the merits of the breach of contract claim. Any judicial economy which might be gained by proceeding with the breach of contract claim in a class action would be lost. Thus, the Court concludes that Duchardt has failed to satisfy the requirements of Rule 23(b)(3) with regards to Subclass I.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Leave to File Plaintiff's Reply in Opposition to Defendant's Sur Reply (Clerk's

No. 69) is GRANTED, however, Plaintiff's Motion for Class Certification (Clerk's No. 22) and Defendant's Motion to Strike the Declaration and opinions of Jeffrey K. Dellinger (Clerk's No. 28) are DENIED.

IT IS SO ORDERED.